**Application of George E. BLAKE and Roy T. Jacks.**

**Patent Appeal No. 7480.**

United States Court of Customs and Patent Appeals.

Nov. 4, 1965.

Charles R. McKinley, E. J. Balluff, Detroit, Mich., for appellants.

Clarence W. Moore, Washington, D. C. (George C. Roeming, Washington, D. C., of counsel), for the Commissioner of Patents.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH, and ALMOND, Judges.

MARTIN, Judge.

This is an appeal from the Board of Appeals which held claims 6, 7 and 10 in appellants' application [1] to be obvious variations of prior patents to Booth [2] and Tyson.[3]

The invention relates to a roller bearing assembly consisting of a series of cylindrical rollers having annular grooves near each of their ends. The necks formed by the grooves snap into identical slotted planar retaining rings which position the rollers for rotation without frictional engagement or axial skewing therebetween. The rollers themselves are entirely conventional, while it is the number, type and placement of the retainer rings which is of patentably crucial importance to the claimed assembly. Exemplary claim 10 reads:

> 10. A roller bearing assembly comprising a series of identical cylindrical rollers each provided with a narrow annular groove adjacent but inwardly of each end thereof to define a pair of opposed radially extending shoulders separated by a reduced diameter cylindrical portion defining a trunnion at each end of said rollers, a pair of axially spaced flat annular retaining rings each having a series of uniformly and closely spaced radially extending slots opening from an edge thereof, each ring having the same number of such slots as the number of such rollers in the bearing assembly, said trunnions being freely journaled in

1. Their application is serial No. 114,058, filed June 1, 1961, and entitled "Roller Bearing."

2. U.S. Patent No. 1,806,279 issued May 19, 1931.

3. U.S. Patent No. 2,016,526 issued October 8, 1935.

said slots in said retaining rings so that the planes of said rings are normal to the axis of each of said rollers whereby to position said rollers in parallel relation to the axis of said bearing, said shoulders being parallel to and engageable with opposite sides of said retaining rings to limit axial movement of said rollers and to prevent skewing thereof and to retain said rings in said parallel relation, said rings being provided with means at the open ends of said slots engageable with said trunnions to retain said trunnions in said slots, said rollers being free to rotate under load while retained in said rings and said rings retaining said rollers in parallel relation and against axial separation, all of said slots being spaced so as to accommodate the maximum number of said rollers within the annulus defined by said rings.

Further details of the claimed assembly will emerge in the discussion of the references.

The Booth reference discloses a bearing assembly consisting of cylindrical rollers, annular grooves at the ends of which permit the rollers to fit into slotted planar end retainer rings. The slots in appellants' retainer rings are horseshoe-shaped radial slots which open on the outer edge of the ring in one modification and on the inner edge in another. In contrast, the slots in the planar end rings of Booth have their entrances on the outer edge to generally extend inwardly in a radial direction, but the slots then laterally turn to communicate with semi-circular notches. The rollers of Booth, after being introduced radially into the slot openings, are moved laterally in the slot until they snap into the semi-circular notches. The locus of a point on the axis of the roller during that assembling operation would generally trace an L-shaped path, while that of appellants

snaps directly in, following a straight line radial path. The rings of both appellants and Booth are snap-in type rings, that is, the slots are slightly reduced at their openings as compared to the necks or trunnions of the rollers so that the rollers may pass into the semi-circular bottom of the slot or notch by the application of pressure on the rollers.

Appellants also show and claim a second modification of the retaining rings which comprises more nearly U-shaped slots, the upper wall portions of which, after insertion of the rollers, may be peened or staked-over to form horseshoe-shaped slots and thereby retain the rollers. Booth does not show such a modification. Claims 6 and 7 on appeal are specific to the snap-in and stake-over modifications respectively.[4]

The Tyson reference shows a bearing assembly having a single retainer ring used to secure tapered rollers between conical bearing surfaces, in which assembly the ring is journaled at the midpoint of the roller axis. Tyson shows radial slots in his retainer ring which open either at the outer or inner edge of the ring; the slots are either of the horseshoe-shaped snap-in type, or of the U-shaped, stake-over type. The retainer ring is not planar, being slightly conical, or dish-shaped, in order to accommodate and retain the rollers in the proper orientation for positioning between the conical bearing surfaces.

The similarities and differences between appellants' bearing assembly as a whole and those of the prior art may be stated thus: Booth shows the concept of using two planar end retainer rings to secure cylindrical rollers in an easy to handle self-contained assembly, while Tyson shows the ring type used by appellants. While Booth uses two end rings, they have L-shaped slots which do not permit the use of as many rollers as could be accommodated with U-shaped radial slots. While Tyson shows the type

---

4. Appellant discloses yet another modification, a retainer ring assembly in which a second concentric ring fits over the open end of the U-shaped slots in the regular ring. Since no separate claim is directed to this modification, and the art pertains to broad claim 10, no additional issue is presented by this modification.

of retainer ring used by appellants, one having horseshoe or U-shaped slots, he uses only a single ring at the mid-point of the rollers, which ring is slightly conical in shape to accommodate for use with conical bearings. The issue under 35 U.S.C. § 103 is whether the combination of the references properly shows the claimed invention as a whole to be obvious, particularly in view of affidavits purporting to show nonobviousness.

Booth teaches the use of two end rings to secure cylindrical rollers by a "snap action" type slot to form a "rigid unit which cannot be twisted out of alignment by any stresses to which it may be normally subjected." Tyson discloses the concept of the particular type of slot used by appellants, a horseshoe or U-shaped radial slot. Such slots are taught by Tyson to permit:

> * * * the use of substantially the largest complement of rollers which can be accommodated in the pitch circle of the group [ring]. * * * If any smaller number of rollers is desired for lighter loads and higher speeds, the same spacer ring can be used, and some of the rollers omitted, * * *.

In this quote from Tyson we find the suggestion to use his type of slots in a retainer ring to permit greater loads in a proportion dependent on the number of bearings. Thus we are compelled to agree with the board's analysis wherein it stated:

> At best, appellants have used each of two known art features, each for its own known utility. These are (1) rings at both ends of roller bearings for the same purpose as in Booth and (2) a slot arrangement as in Tyson for the purpose fully disclosed by Tyson in the first paragraph of his specification, i. e. to permit the use of the maximum complement of rollers. Thus, appellants have merely utilized known features for their known purposes to give only results that the art fully teaches and thus makes obvious.

Two affidavits have been filed by appellants, one by appellant Jacks and another by one Gerst, apparently a qualified engineer in the power transmission art. Gerst states:

> Although I have examined literally thousands of power trains and transmissions, I have never seen any bearing construction in use like that disclosed in * * * [the Tyson reference]. At one time there was a Tyson Bearing Company of Massillon, Ohio, which is now a part of SKF Industries. So far as I know, Tyson Bearing Company or SKF Industries never made and sold a tapered bearing of the construction disclosed in the above-mentioned Tyson patent.

Gerst concludes that the instant bearing assembly "provides at least a 20% increase in bearing capacity and an even greater increase in bearing life over conventional journal roller bearings." An ad of the Timken Roller Bearing Co. appearing in the Wall Street Journal under date of September 13, 1962, indicates that a 10% increase in bearing capacity lengthens bearing life by 37%.

The Jacks affidavit relates the substitution of the claimed bearing having 14 rollers for an original equipment "Bower cage type straight roller bearing * * *" having 11 rollers, used as the "pinion pilot bearing on a 1960 Ford car." At the conclusion of 25,000 miles of driving "the bearing was removed and showed no evidence of any wear of any kind." Continuous satisfactory use on a grinder of other prototypes of the claimed bearing is also related in the affidavit.

We do not find the affidavits directed to non-obviousness. As exhibited in oral argument, the conventional bearings are of the tie rod type, about which Booth states:

> It will be apparent that the bearing structure described does not require tie pin or spacing rollers to hold the bearing together as a unit. * * *

Insofar as the affidavits relate to such bearings as the conventional bearings

against which the claimed bearings are compared, they are not directly relevant to the references which do not disclose tie rod type bearings. Insofar as the affidavits show increased load capacity over bearings containing fewer rollers, they merely confirm the teachings of Tyson. We do not find them to aver or prove that the relationship of increased life as proportional to the increase in number of rollers or load capacity to be the discovery of appellants. The relationship does not appear unexpected or due to other than what naturally results from the teachings of Tyson. The Timken ad is quite obviously of no additional weight as an evidentiary document.

■■ The statements of Gerst to the effect that he has never seen a Tyson bearing in use and that:

> * * * So far as I know, Tyson Bearing Company or SKF Industries never made and sold a tapered bearing of the construction disclosed in the above-mentioned Tyson patent.

are highly qualified, negative statements based on an unknown amount of personal observation. Such type of affidavit ignores the fact that patents are valid as references for whatever they disclose; the statute does not require commercial use of the invention disclosed therein to qualify the disclosure for use as a reference. The Jacks affidavit similarly is not relevant to the issue of non-obviousness since it is not comparative. As the solicitor notes, it establishes at best no more than that the bearings were reduced to practice and were operable to appellants' satisfaction.

■ We have considered appellants' remaining arguments, inter alia, that the age of the references is probative of non-obviousness, but find them unconvincing of a different result. Thus we fail to find that the board committed reversible error in affirming the examiner's rejection of claims 6, 7 and 10 as unpatentable over Booth in view of Tyson. The decision of the board is affirmed.

Affirmed.